IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARILYN JOHNSON, as guardian and
next friend of Holden B. (a minor),

        Plaintiff,

  vs.                                                              No. CIV 96-465 LFG/DJS

UNITED STATES OF AMERICA,

        Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court on a nonjury trial held February 17, 18, and 19, 1998. Set forth below are the findings of fact and conclusions of law of the Court.

### Findings of Fact

1. This is an action brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, 28 U.S.C. § 1331 and 28 U.S.C. § 2201-2202.

2. Plaintiff Marilyn Johnson ("Johnson") is guardian and next friend of Holden B. ("Holden"), a minor. Johnson is Holden's mother.

3. Johnson brings this action for injuries suffered by her son as a result of a sexual assault committed by three classmates while Holden was a boarding student at the Chuska Boarding School ("Chuska School") operated and administered by the Bureau of Indian Affairs ("BIA"). Specifically, Johnson brought claims for sexual assault and battery due to breach of fudiciary duty of care, assault and battery due to breach of fudiciary duty of care, civil rights violation, intentional infliction of

emotional distress; negligent infliction of emotional distress, breach of custodial duty, failure to supervise and negligence per se. In an Order entered on August 28, 1997, the court dismissed all of Johnson's claims except for breach of custodial duty and failure to supervise.

4. Johnson originally named as Defendants the United States Department of the Interior, the Bureau of Indian Affairs, the Office of Indian Education, the Chuska Boarding School, and Gilbert Manuelito in his personal and official capacity. On June 25, 1997, the Court ordered that Gilbert Manuelito be dismissed and that the United States be substituted for the above-enumerated defendants.

5. Defendants John Does 1-4 are minors. The Court's docket sheet reveals that service has not been effectuated on those defendants.

6. Holden was born on May 4, 1983.

7. For most of Holden's early childhood, his parents were married and his family intact.

8. However, this situation was short-lived. Holden's father was abusive and an alcoholic and his parents eventually divorced.

9. The family breakup caused Holden to experience significant emotional, social and academic problems. A counselor opined that Holden had a separation anxiety disorder as a result of his father's leaving the family home, and teacher evaluations reveal that Holden had behavioral problems while a student at Rehobeth Christian School. Holden was said to have occasionally picked on smaller children and made them cry.

10. Due to a change in Johnson's employment, Holden was enrolled at Chuska School for the 1993-1994 boarding year.

11. Holden was ten years old and in the fourth grade.

12. Defendants John Does 1-4 were student residents for the same boarding year.

13. The Chuska school is located in Tohatchi, New Mexico and is within the Eastern Agency of the BIA on Trust lands held by the United States for the Navajo Nation. The Chuska school is administered by the BIA.

14. The purpose of the Chuska school is as follows:

> The mission of the Chuska school, in partnership with its communities, is to enable students to become literate, creative, self confident and responsible citizens who are problem solvers and risk takers by providing an ever developing holistic educational program which empowers teachers and students alike and is built on the cultural heritage of each student.

15. The Chuska School provides both primary and secondary education.

16. Boarders are received into the dormitory on Monday morning. They remain at school and reside in the dormitory through Thursday evening. They leave the dormitory for class on Friday morning and, at the conclusion of the school day on Friday, are released to parents, relatives or other custodians for the weekend. The boarders return to school on Monday mornings.

17. When Holden was in the fourth grade, he was assigned a room in the primary grade dorm. Holden's behavioral problems continued at the Chuska School. For instance, Holden continued to pick on the younger, smaller student residents. As a consequence, he was moved from the primary school dorm to the middle school dorm, W-2.

18. The middle school dorm houses grades five through eight. Had Holden not been held back a year, he would have been in the fifth grade and housed in this dorm.

19. Holden, at age eleven, was one of the younger student residents.

20. Gilbert Manuelito was Dorm Manager for W-2 for the 1993-1994 school year.

21. The BIA operates three types of dormitories: one for the primary grades, one for middle school grades, and one for high school. The boarding schools have little autonomy over the design of or staffing requirements for dormitories. Indeed, dormitory construction, room configurations and staffing formulas, are published in BIA manuals. See 62 BIAM §§ 4.18 to 4.21 and Code of Federal Regulations, Part 36, subpart H.

22. The dormitory is laid out so that supervision can be maintained from a central location.

23. Sleeping rooms are designed to balance the resident students need for space and privacy with the school's need to monitor the students' activities.

24. Each room contains twin bunk beds capable of accommodating four students per room.

25. There are no front walls or doors. The entire front portion of the room is open. Likewise, there are no curtains.

26. Sleeping rooms open onto a central corridor and can be observed by the dorm attendant seated at the supervisor's desk.

27. The physical layout of the Chuska School is in accordance with the applicable BIA manuals and CFR's.

28. In April of 1994, fifty-six boys were assigned to the W-2 dorm.

29. Suggested staffing formulas are mandated in the BIA manuals and in Federal regulations. As a result, schools have little discretion in staffing. The staffing formulas vary for the various types of dorms (primary, middle, or high school) and the time of day. The regulations specify that at least one adult be on duty at all times when students are in the dormitory. The suggested evening ratios for the weekdays are as follows: for grades one through six the ratio is one staff per thirty students and for grades seven through twelve the ratio is one staff per fifty students. The regulations also

4

recommend that for grades one through eight, additional staff aides be assigned during the time children in the primary grades are dressing and preparing for the school day.

30. The Chuska school assigned a minimum of two adult supervisors to monitor Dorm W-2 (the middle school dorm) during the evening. There were fifty-six students assigned to the dorm.

31. This staffing number fell within the guidelines set by the BIA.

32. The regulations also prescribed the duties of dorm supervisors and dorm attendants.

33. For example, the dorm supervisors and attendants conducted body checks of the boys on Mondays, Tuesdays, and Thursdays. The students were examined, in their underwear, to ensure that there were no injuries, bruises, cuts, or evidence of any type of physical abuse. In addition, the boys' clothes were likewise inspected for personal hygiene, blood, or any type of injury.

34. A rigorous schedule is followed at the dormitories.

35. Of significance here is the evening schedule. During the evening, the boys would do homework and engage in other leisure-time activities. They were expected to shower and get ready for bed before nine o'clock.

36. "Lights out" took place around nine. This is the period during which the boys would finish preparations to go to sleep or went to sleep.

37. Between 9:30 p.m. and 10:00 p.m., the night shift dorm attendants reported for duty. The night attendants took the place of the dorm attendants who worked the 2:00 p.m. to 10:00 p.m. shift.

38. At ten o'clock, there was a bed check and head count.

39. Thereafter, throughout the night shift, the night attendants do bed checks every hour and

do other tasks, such as collecting the students' laundry, dispensing medication, and laundering clothes, and returning freshly laundered clothes to the students. The laundry machines are not located on the floor where the boys sleep. Thus, all the attendants who are working a particular shift may not be on the floor at the same time.

40. Dorm attendants are charged with providing opportunities for students to exercise leadership responsibilities.

41. The schools desire to provide leadership opportunities to students is incorporated in the students handbook.

> As students become older and mature, it should be expected that they should and will handle more responsibilities. Dorm programs should be developed to teach, train, and allow students a gradual and successful transition from various levels in their lives. For the primary grade dorms, closer supervision of the students can be expected. In the middle school dorms students should be trained to accept and carry out responsibilities in a successful manner. High school dorm programs should emphasize the ability of the students to enter adult society successfully.

42. Simply put, the Chuska school encouraged the assignment of responsible tasks to middle school dorm students by dorm attendants.

43. Grace Mansfield (Mansfield) was employed by the Chuska Schools as a dorm attendant. Following the above policy, she designated Gerald Yazzie (Yazzie), an eighth grader, to be dorm monitor.

44. The duties of a dorm monitor were to assist the dorm attendants during "Lights Out." The dorm monitors carried a flash light and checked to see that resident boarders were in bed. The dorm monitors did not discipline or carry out any other job duties.

45. Mansfield selected Yazzie because he was an honor student, president of the eighth

grade class, and the student delegate to the faculty.

46. There were no indications that Yazzie had any behavioral problems or any inclinations to participate in a battery on a fellow resident boarder. To the contrary, the overwhelming evidence was that Yazzie was an exemplary and a responsible student.

47. On one evening in April, between 9:30 p.m. and 10:00 p.m., after "Lights Out," Andrew Tsosie ("Tsosie"), an eighth grader, came to Holden's room and told Holden that Chandler Curley ("Curley") wanted to see him. Curley was age twelve. Holden followed Tsosie to Curley's room. There, Holden saw Yazzie standing near the closet. Curley was lying on one of the lower bunk beds. Yazzie told Holden to lie down with Chandler, and Holden complied. Yazzie and Tsosie grabbed Holden by his hands and feet. Tsosie pulled Holden's underwear down and Curley pushed his erect penis against Holden's anal area. Although there was anal penetration, there was no ejaculation. Holden struggled to no avail. Time estimates for the sexual penetration range from a few seconds to two or three minutes. Yazzie stood outside as a lookout. The assault on Holden was intentional and specifically planned to avoid detection.

48. From her desk, Mansfield heard a noise or some commotion down the hall. She called out to Yazzie, who came walking down the hall and assured her that all was well.

49. The assault happened during the evening hours when Mansfield was on duty and when Holden, Curley, Yazzie and Tsosie were at the school. Second, the assault took place before it was reported on April 19.

50. In the first two weeks of April, prior to April 19, there were only two days when all four boys and Mansfield were present, April 7th and April 11th.

51. Mansfield testified that she was the only staff person working the night of the assault.

7

52. Mansfield's testimony was contradicted by time sheet records of the dorm attendants. The records confirm that Mansfield was not the only attendant on duty.

53. Assuming, for example, the assault took place on April 7th, three employees were working the evening shift at the dormitory: Dorothy James, Grace Mansfield, and Frances Manuelito.

54. Similarly, if the attack occurred on April 11th, the records indicate that four employees were working the evening shift: Dorothy Becenti, Grace Mansfield, Frances Manuelito, and Patricia Morris.

55. The Code of Federal Regulations and the BIA manual require that two aides be present when up to fifty-six students are in the dormitory.

56. More than two aides were working on the only possible dates of the assault on Holden.

57. On April 19, Holden B. complained to Gilbert Manuelito of being called names. Holden was being teased in the playground for "sleeping with other boys." After learning from Holden of the students' taunts, Gilbert Manuelito, in turn, questioned all of the boys mentioned and made them write statements about the incident. Based on the statements, including Holden's, that the boys were "fooling around" in their underwear, Gilbert Manuelito concluded that there had been no sexual penetration and that the boys were engaged in horse play.

58. The BIA manual requires that when there is evidence of any type of abuse, that a form entitled "Suspected Child Abuse and Neglect" (SCAN) be completed. Reports of any type of abuse are taken very seriously by BIA and in turn the Chuska School. Indeed, the 1993-94

8

Chuska Parent/Student handbook address the prevention and reporting of any child abuse and neglect.

59. The numerous SCAN reports demonstrate how serious abuse complaints are taken and, unfortunately, also show the prevalence of abuse cases in Indian Country. The vast majority of SCAN reports involved physical abuse occurring while a student was at home or away. Some of the SCAN reports dealt with instances of boy and girl contact in upper grades, ie, high school. No instances, however, were reported involving boy-on-boy sexual contacts, and there were no reports concerning sexual abuses committed by children on children. There was an absence of reports of same sex assaults by middle school age children. Moreover, Greg Calles, the Federal Bureau of Investigation (FBI) case agent assigned to this geographic area, stated that in his twenty-five years with the FBI, assigned to Indian Country, this type of same sex sexual assaults would have been extremely rare.

60. Because Gilbert Manuelito determined that there had not been sexual penetration, but horseplay among young boys, he did not complete the SCAN form.

61. Gilbert Manuelito nonetheless contacted the boys' parents about the incident, and he also contacted the Crownpoint New Mexico Police Department and the Chuska school nurse. He arranged for a presentation about personal safety and sexual education.

62. Johnson personally went to see Gilbert Manuelito and was assured that there had been no sexual penetration.

63. Holden told his sister of the battery. His sister in turn told her mother, who then reported the matter to the Federal Bureau of Investigation ("FBI").

64. Agent Calles' investigation disclosed that at least two and perhaps other boys engaged

in sexual activity of the same nature prior to the assault on Holden and subsequent to this incident. None of these incidents were reported to or known by the Chuska school, and prior to the April 19th assault on Holden B.. None of the staff or administration of the Chuska school was aware of the boy-to-boy sexual activity. The FBI case agent concluded that the objectives of the battery on Holden and others were to penetrate the anus of the victims and that the batteries were triggered by dominance of older boys over the younger. None of the boys were prosecuted criminally for the battery on Holden.

65. On April 21, Johnson withdrew her son and daughter as boarders and made them day students.

66. A subsequent physical examination confirmed that Holden B. tested positive for a sexually transmitted disease, chlamydia.

67. As a result of the assault, Holden suffered embarrassment, humiliation, physical and emotional distress.

## Conclusion of Law

1. The Court has jurisdiction based upon the Federal Tort Claims Act ("FTCA"), 28 USC §§1346(b), 2671 et seq., 28 USC §§1331 and 28 USC §§2201-2202.

2. Congress has delineated the term and conditions upon which the government may be sued.

3. United States may only be liable for the acts or omissions of its employees under circumstances where a private party would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

4. To determine the liability of the federal government under the Federal Tort Claims Act, the court applies the law of the place where the alleged negligence occurred. Richards v. United States, 369 U.S. 1, 9, 82 S. Ct. 585 (1962)

5. Accordingly, the Court looks to New Mexico substantive law to resolve the claims. Johnson contends that the United States was negligent and that the negligence proximately caused Holden B.'s damages.

6. Negligence is defined as:

> The term "negligence" may relate to either an act or a failure to act.
>
> An act, to be "negligence", must be one which a reasonably prudent person would foresee as involving an unreasonable risk of injury to [himself][herself] or to another and which such a person, in the exercise of ordinary care, would not do.
>
> A failure to act, to be "negligence" must be a failure to do an act which one is under a duty to do and which a reasonably prudent person, in the exercise of ordinary care, would do in order to prevent injury [himself][herself] or to another.

SCRA 1986, 13-1601

Ordinary care is defined as:

> "Ordinary care" is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes "ordinary care" varies with the nature of what is being done.
>
> As the risk of danger that should reasonably be fore seen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances.

SCRA 1986, 13-1603

Finally, every person has a duty to exercise ordinary care for the safety of the person and the property of others. Under New Mexico's substantive law, the United States had the duty to exercise ordinary care for Holden B.'s safety. Once a duty is established, the foreseeability of harm governs the scope of that duty. Bober v. New Mexico State Fair, 111 N.M. 644, 649, 808 P.2d 614, 619 (1991)

7. Since the instant action took place at a school the court looks to the duty those school authorities have toward students on the school grounds.

8. This question was answered in Bryant v. United States, 565 F.2d 650 (10th Cir. 1977). In Bryant, three Navajo Indian boys enrolled at the Chuska School were injured after running away from the campus. The Tenth Circuit found that in New Mexico, school authorities have the duty to exercise ordinary care in protecting and supervising students while they are on school grounds. However, school authorities do not have responsibility for protective supervision at all places and under all circumstances.

9. The Chuska School did not breach the duty of care, protection, and safety owed to Holden by having inadequate staffing in April of 1994 and was not negligent. The staffing levels at W-2 dorm, on the only two dates that the assault could have taken place, met the staffing levels required by the applicable government regulations. The dormitory's design, staffing, and daily routines reflect the schools intent to protect and provide a nurturing environment for resident boarders. Chuska School followed set schedules for the students in the morning and evening. Evening rituals included a time for lights out, hourly checks, and head counts that are lodged in records. The school monitored potential abuse and neglect by close monitoring of clothes and by doing body checks at bath time. The layouts of the dorm wings also were designed to protect the

student and were in accord with BIA mandates and congressional regulations. The configuration of each room provided each resident boarder with a modicum of privacy, but allowed for constant surveillance of the students.

10. In sum, there has been no per se showing of negligence on the part of the United States. The Chuska school met all of the applicable staffing and design guidelines as contained in the BIA manuals federal regulations.

11. The Chuska school did not breach its duty of ordinary care owed to Holden by virtue of Mansfield's selection of Yazzie as a dorm leader. The selection of Yazzie was consistent with the school's policy that encouraged student leadership opportunities, and it was not foreseeable that Yazzie would act in this manner.

12. Yazzie was an honor student and eighth grade class president. He had served as liaison between the students and faculty and had a reputation as a bright and good student. Nothing in Yazzie's past behavior would place the United States on notice that Yazzie would conspire, commit and conceal a sexual assault on a 10 year old boy.

13. Manuelito acted in accordance with the school's manual in requesting that Gerald Yazzie assume responsibility and assist her out during "lights out".

14. There was no reason to believe that Yazzie would intentionally hurt fellow students by serving as a look out and by covering up the intentional battery.

15. Abuse and neglect of children is not a unique occurrence in the United States and in particular Indian Country. Indeed, there have been reports of abuse involving student boarders at Chuska school primarily during weekend furloughs and, in limited circumstances, between high

school male and female students at the school. No reports of same sex, sexual misconduct, especially involving boys at the ages of these involved in this incident were previously reported.

16. Neither the testimony nor documentary evidence support the inference that the school was aware of or could have anticipated same sex, student on student sexual assaults, especially by students as young as those involved in this assault. The Chuska school had no prior notice or reason to believe that John Does 1-4 would pursue the types of actions in April and up until the early part of May. It was not reasonably foreseeable that a 12 year old boy, assisted by other students of the same approximate age, would sexually assault an 11 year old boy.

17. The FBI case agent, with 25 years of experience, including investigation of 125 sexual assault cases, characterized this incident as one of dominance between older and younger boys and found this was an isolated incident, that occurred as a result of an intentional planned act. He testified that based on his investigation and experience, there were no warning signs that could have alerted the school that this type of incident would occur; that no act or omission of the dorm staff contributed to the incident, and that nothing that could have been done would have prevented the incident.

18. The Chuska school did not breach its duty of ordinary care by failing to protect Holden from sexual assault. It was not foreseeable that such an incident would take place.

19. The Chuska school exercised ordinary care in securing Holden's general welfare.

20. The school is not a guarantor of the safety of its students, and the fact that the assault occurred or that Holden B. was injured and suffered damages, is not evidence of negligence.

21. The Chuska school followed the appropriate regulations for dormitory students.

22. Holden B. was the victim of an intentional tort planned and committed by fellow students. He has suffered psychologically as a result of the intentional acts of John Does 1-4 and has been damaged. However, the culpable defendants, have not been served and are not before the Court. The only defendant properly before the Court is the United States and as discussed above, the United States is not liable to Holden.

23. Judgment should be entered in favor of the defendant and plaintiff's remaining counts, Count II (Breach of Custodial Duty) and Count XII (Failure to Supervise) should be dismissed and the action should be dismissed with prejudice.

24. Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, Defendants John Does 1-4 are dismissed without prejudice due to the failure to effectuate service in a timely manner.

*(signature)*
LORENZO F. GARCIA
UNITED STATES MAGISTRATE JUDGE